## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

08 CV 4360

| | | |
|---|---|---|
| WEDGEWOOD TACOMA LLC, Individually And On Behalf of All Others Similarly Situated, | ) ) ) | **CIVIL ACTION NO.** _____ |
| Plaintiff, | ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| v. | ) ) | |
| CITIGROUP INC., CITIGROUP GLOBAL MARKETS, INC., and CITI SMITH BARNEY, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

RECEIVED
MAY 0 8 2008
U.S.D.C. S.D. N.Y.
CASHIERS

1.    Plaintiff makes the following allegations, except as to allegations specifically pertaining to Plaintiff and its counsel, based upon the investigation undertaken by Plaintiff's counsel, which included review and analysis of, among other things, filings with the Securities and Exchange commission ("SEC"), regulatory filings and reports, interviews with purchasers of auction rate securities, news releases and media reports.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### NATURE OF THE ACTION

2.    This is a federal securities class action brought on behalf of all persons or entities who purchased one or more auction rate securities (sometimes referred to using the acronym "ARS" (or plural "ARSs"), and also known as, among other things, auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities, auction paper, and auction rate bonds) offered for sale by the Defendants herein between May 8, 2003, and February 13, 2008, and continued to hold said securities as of February 13, 2003, inclusive (the "Class Period").  This action is brought

under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as the Investment Advisors Act, 15 U.S.C. § 80b-1 *et seq.*

3.      Defendants marketed and sold ARSs by representing to investors that, in essence, these were as good as cash or cash equivalents, that ARSs were equivalent to money market funds or certificates of deposit (CDs), and were very liquid and safe investments, such as money market funds or similar investments suitable for short-term investing, only with slightly higher (approximately a percentage point) interest rate returns or dividend yields.

4.      However, Defendants knew material contrary facts about ARSs, but failed to disclose this information to investors to whom they were marketing and selling these securities. For instance, Defendants were aware that (a) these securities were in fact not cash equivalents or suitable alternatives to investments such as money market funds or CDs; (b) ARSs' continuing liquidity was very uncertain, even at the time of sale of these securities at auction, because it depended substantially, if not completely, on Defendants' artificially supporting the ARS market; (c) in fact no real market for these securities could or would exist as it did, and that most if not all of the auctions for these securities would be overwhelmingly, if not completely, doomed to failure, were it not for Defendants' and other broker-dealers' constant and pervasive support and propping up of these auctions by always, or nearly always, serving as buyers of last resort for these securities; and (d) these securities would (and did) in fact become illiquid as soon as Defendants ceased their routine and pervasive artificial support for the ARS auction market.

5.      Investors finally gained a glimpse of the truth for themselves on February 13, 2008, with the sudden failure of the vast majority (almost 90%) of all ARS auctions, caused by Defendants and all other major broker-dealers' sudden cessation of their prior routine and pervasive support for these auctions and the ARS market. This sudden and devastating collapse

left investors in over $300 billion in ARSs unable to liquidate securities which had been pitched

to them by Defendants as cash equivalents and highly liquid, similar to money market funds or

CDs.    Numerous investors abruptly became stranded in ARSs investments, unable to tap

significant sums of their own money, in some cases large portions (or all) of their life savings, in

many cases unable to obtain urgently needed funds for such important uses as tax obligations and

home purchases, among many others.

6.      The collapse of the ARS market had a significant negative impact on the

recognized value of these securities, with Citigroup itself announcing in April of 2008, that it

was writing down approximately $1.5 billion in ARSs held in its own inventory, and other

brokerages and corporate ARS holders taking similar write-offs, and numerous other companies

announcing similar write-downs.    Indeed, when Plaintiff demanded that Citigroup and/or the

issuers of certain of its ARS investments purchase them back at face value following the collapse

of nearly the entire market on February 13, 2008, this request was refused (without even a

counter-offer at a lower price), a further indication that Citigroup and others in the market for

these securities are of the view that they have significantly declined in value.

7.      While the ARS market collapsed, Citigroup and other broker-dealers nevertheless

continue to improperly profit from the investors to whom they sold ARSs in connection with

these investments.    For instance, despite regularly failing auctions, brokerage firms (including

Citigroup) continue to earn fees -- approximately 0.25 percent of the amount of the shares or

notes outstanding on an annual basis -- totaling approximately $825 million this year alone.

Some broker-dealers (again, including Citigroup) have even further victimized investors by

allowing those needing funds to access these funds tied up in ARSs only in the form of an

3

interest bearing loan, made against their ARSs' value, and thus requiring their customers to pay interest on loans against their own money.

8.      Moreover, recently, upon information and belief, even while ARSs were being aggressively marketed to individual investors by broker-dealers (including Citigroup) in 2007, the corporate clients of broker-dealers (such as Citigroup) were fleeing the securities in droves, having apparently become concerned that these securities had high liquidity risks and were not cash equivalents. Indeed, the "Big Four" accounting firms advised their corporate clients (on information and belief, including Citigroup) in 2005 to change the way ARSs were treated on their balance sheets, and to stop classifying them as cash equivalents. Despite its knowledge of such developments, Citigroup continued their deceptive marketing of ARSs to the Class members herein.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5), and also the Investment Advisors Act, 15 U.S.C. § 80b-1 *et seq.*

10.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337. Defendants maintain their principal places of business within this District and do substantial business herein, and many of the acts giving rise to the violations complained of herein took place in this District.

11.      In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

12.    As set forth in the accompanying certification, incorporated by reference herein, Plaintiff Wedgewood Tacoma LLC purchased ARSs that were marketed, sold and/or underwritten by Citigroup during the Class Period, and has been damaged thereby. Plaintiff continued to hold such ARSs as of February 13, 2008.

13.    Defendant Citigroup, Inc. is an entity incorporated in Delaware with principal executive offices in New York, New York, and a large underwriter and broker-dealer of ARSs.

14.    Defendant Citigroup Global Markets, Inc. (upon information and belief, sometimes referred to and including Citigroup Global Capital Markets, Inc.) is an entity incorporated in Delaware with principal executive offices in New York, New York, and is a wholly-owned subsidiary of Citigroup, Inc.  Citigroup Global Markets, Inc. is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act, and belongs to both the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA"). Citigroup Global Markets, Inc. is reportedly one of the largest underwriter and broker-dealers of auction rate securities in the United States.

15.    Defendant Citi Smith Barney is an entity incorporated in Delaware with principal executive offices in New York, New York, is a division of Citigroup Global Markets, Inc., provides brokerage, investment banking and asset management advice and services to Citigroup clients through a network of financial advisors, and was actively involved in marketing and sale of ARSs to clients.

16.    Unless specifically indicated otherwise, "Citigroup" refers collectively to Citigroup, Inc., Citigroup Global Markets, Inc., and Citi Smith Barney.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

17.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who purchased ARSs from or through Citigroup between May 8, 2003 and February 13, 2008, inclusive (the "Class") and continued to hold them through the end of the Class Period. Excluded from the Class are the Defendants herein, officers and directors of any Defendant, members of any of the Defendants' immediate families, or any of their legal representatives, heirs, successors or assigns, and any entity in which any defendant has or had a controlling interest.

18.    The members of the Class are so numerous that joinder of all members is impracticable. The market for ARSs was estimated at approximately $330 billion in the United States. Citigroup was the one of the, if not the, largest underwriters and broker-dealers of ARSs while the market for such securities existed. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

19.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are, *inter alia*:

(a)    Whether Defendants' actions as alleged herein violated federal securities laws, and/or the Investment Advisors Act;

6

(b)    Whether statements made by or on behalf of Defendants to the investing

public during the Class Period misrepresented or omitted material facts about, among other

things, the extent of the Defendants' and other broker-dealers' creation of and support for the

ARS market, and the liquidity of, and true risks associated with, ARSs and the market for such

securities; and

(c)    To what extent Class members have suffered damages, and the proper

measure of those damages.

20.    Plaintiff's claims are typical of those of other Class members, as all members of

the Class were and are similarly affected by Defendants' wrongful conduct in violation of federal

law which is complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of Class members and has

retained counsel competent and experienced in class action and securities litigation.

22.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it practically impossible for Class members to individually

redress the wrongs done to them. There will be no difficulty in the management of this action as

a class action.

23.    In the alternative, the Class may be certified under the provisions of FRCP

23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class

members would pose the risk of inconsistent or varying adjudications with respect to individual

Class members, as well as establishing incompatible standards of conduct for Defendants;

(b) such separate actions by individual Class members would pose the risk of adjudications with

respect to them which would, as a practical matter, be dispositive of the interests of other Class members who are not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### I.     BACKGROUND

#### A.     How The ARS Market Functions

24.     ARSs are municipal bonds, corporate bonds or preferred stocks with interest rate or dividend yield components which are periodically re-set through "auctions," typically every 7, 14, 28, or 35 days, as set by the prospectus for the security, with interest paid at the end of the auction period. ARSs usually have intermediate to long-term maturities, typically 30 years, or, in the case of preferred stocks, no maturity date. However, due to the interest rate and dividend yield auction re-set component, ARSs are typically priced and traded as short-term securities. ARSs generally trade and are callable at par on the date of auction and/or the date of any interest payment, at the issuer's option. Since being introduced in 1984, the market for ARSs has increased significantly, and, prior to the auction market's collapse in early 2008, was valued in the aggregate at approximately $330 billion.

25.     While previously investments in ARSs primarily had required minimums of $250,000, and were limited to institutional investors, in an effort to market and sell auction rate securities more widely to the general public, such as many of the Class members herein, the minimum investment amount was lowered to $25,000. Because ARSs have historically been auctioned at par value, the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set at auction. The auction

method for these securities were generally described in the prospectus of the fund through which they were offered. However, the auction method was substantially similar for all ARSs. Also, investors were typically not provided with prospectuses for ARSs because they are considered secondary market issues. Accordingly, ARS prospectuses were routinely not provided to any investors purchasing ARSs marketed and sold through Citigroup.

26.    ARSs were typically auctioned, and the interest rate or dividend yield set, through what is known as a "Dutch" auction, in which sequentially increasing bids are accepted until all of the securities at auction are sold. Initial rates are reportedly set low, and then increased to be more attractive to purchasers throughout the course of the auction.

27.    The final rate at which all of the securities are sold at an auction is called the "clearing rate," and uniformly applies to all securities in the auction until the next auction. The clearing rate is the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If multiple bidders bid at the clearing rate, and there are more bids than shares, the shares are divided and allocated between those bidders on a pro rata basis by the auction agent.

28.    An "all-hold" auction occurs if all existing ARS holders determine to hold their ARSs without specifying a minimum rate. In this instance, the rate is set at a level defined in the prospectus, and is termed "All Hold Rate." The All Hold Rate is typically set based on a percentage of a reference rate, such as the London Interbank Offered Rate ("LIBOR") or the Bond Market Association ("TBMA"), or perhaps an index of United States Treasury securities, and is usually a rate that is below the market rate.

29.    During an auction, the four types of orders an investor who has already invested in a particular ARS (an "existing holder") are: (1) a Hold order, which specifies the par amount of the securities an existing holder wishes to continue to hold, regardless of the new interest rate

9

or the clearing rate; (2) a Hold at Rate order, which specifies the amount of securities an existing holder wants to hold as long as the clearing rate is above a specified rate, and if the clearing rate falls below that rate, the existing holder is obligated to sell the securities it holds; (3) a Sell order, which specifies the par amount of ARSs an existing holder wishes to sell, whatever the clearing rate; and (4) a Bid order, which specifies the par amount of securities an existing holder wants to purchase as long as the clearing rate does not go below a specified rate. If an existing holder fails to place an order, that holder will be determined to have elected to continue to hold its securities regardless of the clearing rate.

30.    Potential holders, or holders seeking to make investments in new ARSs, are reportedly restricted to placing bids to purchase securities at a specified rate, and if the clearing rate is above that rate, the potential holder will receive securities, but will not receive securities if the clearing rate is below that specified rate. If the clearing rate matches the specified rate, the potential holder may receive some portion, all, or none of the securities.

31.    "Failed auctions" occur when there are insufficient orders to purchase all the securities being sold, and the ARS rate was set to a "maximum rate" applicable to the specific securities being auctioned, as set in the prospectus. This maximum rate is often calculated by applying a specified multiple to a reference rate, such as the LIBOR, the TBMA index, or an index of U.S. Treasury securities. This maximum rate is also often a specified fixed percentage, and based on a particular reference rate.

32.    In the case of a failed auction, none of the current holders are able to sell their shares or exit their positions in ARSs through the auction. While purportedly designed to generally compensate current holders for this loss of liquidity, the maximum rate for many ARSs (especially for investments in corporate debt securities or preferred stocks) is relatively small,

and holders unable to exit their positions receive limited interest on their illiquid investments in the case of a failed auction.

33.     The issuer of each ARS selects one or more broker-dealers to underwrite the offerings and/or manage the auction process.  Each ARS issuer also selects an "auction agent," usually a commercial bank, to perform certain functions such as collecting orders from participating broker-dealers, determining the amount of ARSs for sale (which is equal to the size of the auction minus hold orders), and organizing the bids in order of increasing rates to determine winning bids.  After determining the clearing rate, the auction agent is also responsible for allocating ARSs available for sale to the participating broker-dealers based upon the orders submitted by those broker-dealers.  In the case of multiple bids at the clearing rate, the auction agent allocates the ARSs to those bidders on a pro rata basis, with existing holders usually receiving preference over new bidders at the same rate.

34.     Investors are restricted to placing orders through the selected broker-dealers, and issuers pay annualized fees to each broker-dealer selected to manage an auction.  Investors must place orders by deadlines set by the broker-dealers, which are typically set early enough to give the broker-dealers adequate time to process and analyze the submitted orders before having to submit the orders to the auction agent, and, in turn, giving the broker-dealers enough time to determine what, if any, orders they want to place for their own accounts.

**B.     The May 2006 SEC Consent Decree**

35.     Citigroup and other broker-dealers have historically engaged in a number of practices to manipulate the auction process in their favor.  For instance, broker-dealers submit their own orders to purchase or sell shares for their own accounts.  In 2004, the SEC began to investigate certain manipulative practices affecting the ARS market, which investigation resulted in a 2006 consent decree between the SEC and a number of major broker-dealers, including

11

Citigroup. Pursuant to this consent decree, these broker-dealers, including Citigroup, were

mandated to disclose certain practices to investors and to stop engaging in certain other practices.

The Consent Decree stated that broker-dealers often intervened in auctions for their own benefit,

rather than for the claimed objective of maintaining liquidity and, at times, placed bids to prevent

auctions from failing, without adequate disclosures. The SEC allowed the broker-dealers to

continue to place orders for their own accounts even after receiving notice and information of

what orders their customers were going to place, as long as the broker-dealers "disclosed" this

practice to their customers.

II.    **CITIGROUP REGULARLY MADE MATERIAL OMISSIONS AND MISREPRESENTATIONS CONCERNING THE NATURE AND RISKS OF ARS INVESTMENTS, AS WELL AS THE CONDUCT OF THE BROKER-DEALERS IN ARTIFICIALLY CREATING AND SUSTAINING THE ARS MARKET**

A.    **Citigroup's Use Of A Uniform And Standardized Sales Pitch To Market And Sell ARSs**

36.    During the Class Period, the entire ARS market and the auctions upon which it

depended were virtually wholesale creations of Citigroup and the other broker-dealers, and their

constant participation were its lifeblood. Without them, this market could not and would not

exist as it did. In fact broker-dealers, including Citigroup, routinely and as a matter of practice

not only intervened in these auctions and served as a buyer of last resort, to prevent failed

auctions, but did so to the extent that the ARS market would not even have existed as it did, and

could not be sustained, without this routine intervention to create the market itself and artificially

prop it up.

37.    As alleged herein, however, Citigroup directed its sales force to provide its

customers with a uniform, standardized sales pitch that was materially deceptive by omitting to

disclose that without the constant and consistent voluntary participation of Citigroup and the

other broker-dealers as buyers of last resort, not only might an individual auction fail here or

there, virtually the entire market would collapse. Both the sales pitch and Citigroup documents that were regularly disseminated to the class members were materially deceptive in representing that ARS were essentially cash equivalents.

### 1.    The True But Undisclosed Nature Of The Auction Process And the ARS Market

38.    The true but previously undisclosed nature of the ARS market has been recognized by commentators following the ARSs market's wholesale collapse on February 13, 2008. One report appearing in "Market Pipeline" on February 28, 2008 entitled "Auction Rate Securities: Manipulated from the get-go" reported being informed by traders that "the failed auction rate securities market was always dependent on stabilization by dealers." While this report recognized that the term "stabilization" had a specific technical definition as used by the SEC, whether "the market manipulation by the dealers f[ell] within SEC guidelines" was doubtful, considering that "[t]he immediate cause of the auction failures was the pullback of the banks and brokerages. In mid-February the financial institutions conducting the auctions stopped acting as principals or buyers of excess ARS inventory . . . "

39.    This February 28, 2008, article astutely observed that:

> "Wall Street executives have defended their conduct, saying losses on holdings such as mortgage assets have curtailed their ability to use their balance sheets to support faltering markets," the Wall Street Journal's Randall Smith and Liz Rappaport report in their article today about a large bond marketer lashing out against Wall Street over the auction failures.
>
> *But this raises the question of why the markets were faltering in the first place.* In our earlier reporting, we revealed how accounting changes may have set some corporate buyers running for the exits from this market. *More recent conversations with a broader array of bond traders and dealers points toward another possibility—the market never had enough buyer demand to support itself and has been dependent on stabilization from the banks for a very long time.*

> *"The truth is there was no natural auction success rate. But for the banks acting as market makers, these auctions would have failed from the get go,"* [stated one] bond trader . . .
>
> *Rather than merely acting as buyers of the last resort, the financial institutions have been consistently called upon to stabilize the ARS market. In many cases, investors were led to believe the market was much healthier than it has ever been.* [Emphasis added].

40.    A September 29, 2006, speech to the Tenth Annual Conference of Women in Public Finance by Martha Mahan Haines, the Chief of the SEC's Office of Municipal Securities, also confirms Citigroup's failure to adequately disclose the true nature of the ARS market to ARS investors such as the Plaintiff and other Class members.

41.    As Ms. Mahan Haines recognized, "it appears that the way rates are actually set on auction rate securities often may bear little resemblance to the way the process was described in offering statements."

42.    Ms. Mahan Haines also stated, *inter alia*, that:

> *It is true that, due in large part to [broker-dealer] intervention, there have been few "failed" auctions, resulting in windfall interest rates for investors until the next auction, or "all hold" auctions, resulting in below market rates briefly benefiting issuers.* Broker-dealers also intervened when the rate that would be set was not, in that broker-dealer's opinion, an appropriate market rate. (But wasn't a determination of the market rate the very purpose of an auction?) We are told that this is in the best interests of both issuers and investors. But is it? *The true liquidity risk, volatility and fragmented nature of this market was not made clear to issuers or investors.* Furthermore, broker-dealer intervention does not necessarily set the rate at the same point as would be set in a successful multi-bidder auction. *This intervention supported the rapid growth of this market to over $200 billion. Was it in the best interests of issuers and investors to be so heavily dependent on broker-dealer intervention to support the expansion of that market?*

*    *    *

14

> *To simply say that a Broker-Dealer may submit orders in Auctions for its own account, in which case it might have an advantage over other bidders because it would have knowledge of other orders placed through it for that Auction just does not give an accurate picture of the reality of how this market functions. Disclosure should make it clear that broker-dealers commonly intervene in auctions, ...* I would suggest that as part of your own due diligence investigation, you should ask for *information regarding the frequency of broker-dealer bidding . . . Do not dance around this issue: describe what really happens flat out.*

\*    \*    \*

> Perhaps consideration should be given to a different name for this type of security or of the process by which rates are set? "Managed auction process" and "bidding system" have been suggested to me. . . . I recognize that "BS Securities" is not an appealing acronym and I leave it to those more creative than me to come up with an alternative title.

\*    \*    \*

> You have all heard me talk about the importance of market integrity and investor confidence before. *I suggest that the lack of transparency regarding the actual rates set in these auctions undermines both. Market participants should insist that the rates set in these auctions and other critical information be made public.* You have all heard the remark by Justice Brandeis to the effect that sunlight is the best disinfectant. The former head of investment banking at one firm put it this way: "We believe everybody is honest, but they are more honest if you watch them like a hawk." *Giving investors, potential investors, issuers and broker-dealers a way to monitor the rates, the bidding ranges and number of bids received, would allow them to see inside the black box of this market. Disclosure of such information, which is routine in Treasury auctions, would promote market integrity, enhance investor confidence and improve pricing efficiency.* Transparency would benefit everyone. [Emphasis added].

43.    Despite these admonitions, Citigroup and other broker-dealers decided to maintain the status quo and keep the ARS market as an opaque "black box", keeping its true nature obscured from investors such as the Plaintiff and other Class members so that they could continue to reap huge profits from the underwriting, marketing and sale of ARSs to unsuspecting

investors such as the Plaintiff herein and other Class members as highly liquid cash equivalents, using a uniform and standardized sales pitch created and issued by senior management.

44.    According to an article recently appearing in the New York Times entitled "It's a Long, Cold, Cashless Siege for Investors" on April 13, 2008, as the ARS market became much larger, "it became harder for Wall Street to arrange true auctions regularly" and so these "auctions" devolved into what one industry observer termed a "managed bidding system," but a system which was hidden from investors by the materially misleading omissions and misrepresentations made by Citigroup and the other broker-dealers.

45.    According to that New York Times report, Joseph S. Fichera of Saber Partners observed that "[a]uction securities became a managed bidding, not a true investor auction" and that "investors never knew how many investors there were, how often the brokerage firms were stepping in to make the system work, *nor that the broker' support could stop all of a sudden*. If we had transparency in the system, investors could have judged the ability to sell in the individual auctions and bid accordingly." [Emphasis added.]

### 2.    Citigroup's Standardized And Uniform Deceptive Sales Pitch And Document Disclosures

46.    Citigroup concealed the true nature of the ARS market, as described above, from the Class Members because it had a strong financial interest in promoting the sales of ARS. ARSs were a highly profitable undertaking for Citigroup in a variety of respects, and for the Citigroup financial advisors who marketed and sold these securities. Citigroup, as one of the largest underwriters and broker-dealers of ARSs, received significant underwriting fees from the issuers of these securities, entered into broker-dealer agreements with the issuers, and was also paid fees for participating in the management and operation of the auction process. Citigroup also acted as a principal in trading in ARSs for its own account using the inside information it

had access to and obtained. Individual financial advisors also were highly incentivized to market and sell as many ARSs as possible, considering that they received compensation by Citigroup for each ARS sold.

47.    So as to sell as many ARSs as possible, and in turn to artificially prop up and manipulate the ARS auction market, and at the direction of and/or with the approval of top Citigroup management, Citigroup developed and used a uniform and standardized sales pitch that was presented to Plaintiff and the other class members by Citigroup financial advisors, falsely representing that ARSs were liquid, cash equivalents and suitable alternatives to money market funds or CDs, and were safe and secure vehicles for short-term investing.

48.    Using this standardized sales pitch, Citigroup financial advisors throughout the United States marketed and sold ARSs to current and potential Citigroup clients on the basis that they were equivalent to cash, money market funds, and CDs, and were safe, even as safe as high-quality bonds, money market funds or CDs, with slightly higher interest rate returns, and highly liquid short-term investments appropriate even for small investors with at least $25,000 of available cash, and short investment windows.

49.    A former Citigroup financial advisor confirmed that Citigroup financial advisors pitched ARSs as very liquid, safe, cash equivalents that could be redeemed every seven days, and that he was told at Citigroup that ARSs were very liquid and the equivalent of seven day paper. Complaints by numerous individual Class members also confirm that Citigroup was routinely marketing and selling ARS investments during the Class Period using a standardized and uniform sales pitch describing these investments as liquid, cash equivalents and suitable alternatives to money market funds or CDs, but with slightly higher interest rates.

50.    In addition, Citigroup regularly listed ARSs on client monthly account statements as "Money market and auction instruments," thereby falsely representing that the level of risk involved in purchasing ARS was essentially similar to money market investments.

51.    In such communications, Citigroup failed to disclose material facts about ARSs and the ARS market to investors, including information concerning the risks associated with, and high potential for illiquidity of, these investments.  Citigroup failed to disclose, among other things:

- that these securities were in fact not cash equivalents or suitable alternatives, like money market accounts or CDs, or short term investments; and

- that these securities' continuing liquidity was in fact highly uncertain, because Citigroup (and other broker-dealers in the ARS market) were themselves artificially creating, manipulating and propping up the ARS market so as to maintain a false appearance of liquidity and stability, and the existence of a true liquid market for these securities.  In fact, this "liquidity" resulted solely from the fact that Citigroup and other broker-dealers *overwhelmingly, if not entirely, created and sustained this market as it existed, and it would not have existed at all as it did without their constant and consistent intervention before February 13, 2008.*  As set forth in subsequent news reports, among other things, the ARS market never had enough independent buyer demand or participation to support itself and had been dependent on the broker-dealers creation of and intervention in the market for a very long time; thus there was no "natural auction success rate."  But for the banks acting as pure "market makers" for ARSs the overwhelming majority, if not all, of these auctions would have failed from the start, or at least long ago.  Citigroup and others have consistently taken steps not only to participate in this market and these auctions in anything resembling a limited fashion, but instead were routinely and pervasively involved to such an extent that their participation effectively *created* the market itself and *overwhelmingly, if not completely, sustained it during the Class Period*, and in all likelihood even years beforehand.

52.    Indeed, even while ARSs were being aggressively marketed to individual investors in 2007, broker-dealers' corporate clients were fleeing the securities in droves. According to the April 13, 2008 New York Times report, at the close of 2006 corporations reportedly owned eighty (80) percent of all ARS issues; as of July 1, 2007, corporate ownership had dropped to "$170 billion of these securities, or just over half of the total outstanding"; and

"through the second half of 2007, corporate investors were dumping their stakes," cutting their aggregate holdings to only $98 billion, or less than 30%, out of a total $330 billion market. As reported in the April 13, 2008 New York Times report, according to one consultant, "[a] number of corporations understood there was a rising threat to their securities; there had been failures and warnings."

53.     This massive corporate exodus apparently followed a shift in the position of the Financial Accounting Standards Board (FASB) with respect to the proper balance sheet classification of ARS investments. In March of 2007, the FASB implemented the change, requiring ARSs to be classified on corporate balance sheets as "short term investments" instead of their previous designation as "cash equivalents." As described above, corporate holders reacted to this change by exiting ARS investments virtually *en masse* over a very short period of time, in order to avoid having to drastically reduce balance sheet cash positions as a result of the FASB directive. In turn, this forced Citigroup and other broker-dealers to maintain even more ARSs on their own books, further straining their own balance sheets.

54.     There were even earlier indications of this impending change. As far back as PricewaterhouseCoopers (PwC) reportedly issued an advisory to its corporate clients indicating that ARSs, which had previously been accounted for as "cash equivalents" on corporate balance sheets, no longer qualified for this treatment and should instead be properly classified as "short term investments." The other "Big Four" accounting firms (including Citigroup's auditor, KPMG) reportedly quickly followed suit, creating a situation in which all four of the major accounting firms reportedly advised their corporate clients to change the way ARSs were treated on their balance sheets, and to stop classifying them as "cash equivalents." Despite Citigroup's knowledge of these developments, Defendants continued to deceive the Class Members by

insisting to them that ARS were cash equivalents and virtually as safe as, and suitable alternatives to, money market funds and similar investments.

55.     Citigroup continued to aggressively market and sell ARSs as liquid and safe investment vehicles, equivalent to cash or money markets funds or CDs, even after Citigroup had determined during the Class Period that the ARS market was likely to seize up due to the fact that Citigroup and other broker-dealers were likely to or would cease propping up the market.

**B.     The Collapse Of The ARS Market**

56.     During the summer of 2007, a small portion (approximately 2-6%) of ARS auctions, apparently involving ARSs backed by sub-prime debt, began to fail.    The rate of auction failures continued and began to increase throughout the end of 2007.    Some of these auctions were operated and managed by Citigroup, but Defendants herein nevertheless continued to maintain that investors should purchase ARSs as liquid, cash equivalents, similar to money markets or such conservative investments, suitable for short-term investing.    However, Defendants continued to fail to disclose the severe risks associated with these securities. Citigroup and other broker-dealers were fully aware (or at the very least recklessly ignorant) of, but failed to disclose, the deteriorating condition of the ARS market, and the high likelihood of an ultimate total collapse which ultimately occurred, due to their own integral role in creating and sustaining the market itself.

57.     Then, on February 13, 2008, a stunning 87% of all ARS auctions suddenly failed when Citigroup and all of the other major broker-dealers abruptly refused to continue to prop up the auctions. The next day, February 14, 2008, it was reported that UBS, a major underwriter and broker-dealer of ARSs, was refusing to support the auction market any longer.    Other major broker-dealers (including Citigroup, Goldman Sachs, Lehman Brothers and Merrill Lynch, among others), decided virtually simultaneously, to overwhelmingly, if not totally, cease

participation in or support of the ARS market and these auctions. Consequently, the entire ARS market, totaling approximately $330 million, shut down virtually instantaneously and completely, with ARS investments becoming illiquid almost overnight.

58.    According to the April 13, 2008 <u>New York Times</u> report, the ARS market shutdown was preceded by the broader credit crisis on Citigroup and other big brokerage houses, as a result of which they became unwilling to put up the substantial capital from their reserves needed to keep the ARS auctions running. The market-wide credit crisis, which began in approximately the first half of 2007, put greater pressure on these brokerages' balance sheets, and in turn caused the Defendants to cease committing the substantial capital necessary to artificially prop up the ARS market, until finally virtually all broker-dealer support for the ARS market vanished, and as a result the market suddenly collapsed.

59.    The collapse of the ARS market had a significant negative impact on the recognized value of these securities. Citigroup itself announced on or about April 19, 2008, that it was writing down approximately $1.5 billion in ARSs held in its own inventory as markets failed. UBS, another of the most prominent players in the ARS market, is also reportedly writing down its ARS holdings. Other corporate holders of these securities have followed suit, for example with Palm taking a write-down of $25.5 million in ARSs and a "reclassification" of these securities as illiquid, and Imclone Systems, Inc., reportedly writing down their portfolio of these securities by $84.9 million. Also, since February 13, 2008, a secondary market has developed in which ARSs are trading at very significant discounts below than their face value.

60.    While the market for ARSs has collapsed, Citigroup and other broker-dealers nevertheless continue to improperly make money from the investors to whom they sold ARSs in connection with these investments. For instance (a) even under these circumstances, as investors

21

are unable tap their money, with a collapsed market and ineffective auctions, brokerage firms (presumably including Citigroup) continue to earn the same fees -- approximately 0.25 percent of the amount of the shares or notes outstanding on an annual basis, generating aggregate fees of approximately $825 million this year alone -- despite that fact that few auctions are currently succeeding; and (b) some brokers (again, presumably Citigroup) are even further victimizing investors by forcing those who need current access to their cash to borrow against the value of their ARSs, sometimes up to the full par amounts, and then charging them interest on these loans.

61.    Defendants' conduct and materially false and misleading statements and omissions during the Class Period caused ARSs to be marketed and sold and traded by Citigroup at artificially inflated prices.  Plaintiff and other Class members purchased ARSs marketed and sold by Citigroup in reliance upon the integrity of the auction market and of the market price of the ARSs, and have suffered damage thereby.

62.    Defendants materially misled public investors and artificially created and enabled the perpetuation of the ARS market, thereby inflating the price of ARSs marketed and sold by Citigroup.  Defendants accomplished this by making materially false and misleading public statements and failing to disclose material facts necessary to render Defendants' statements, as set forth herein, not false and misleading, and thereby creating an unrealistically positive assessment of, and thereby artificial demand for, the ARSs underwritten, marketed and sold by Citigroup, and causing those securities to be overvalued and artificially inflated at all relevant times.

## NO SAFE HARBOR

63.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein this

Complaint.  Nor were the forward-looking statements pleaded accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the Defendants responsible for the statement knew was it was false and misleading, and/or the forward-looking statement was authorized and/or approved by a director and/or an executive officer of Citigroup who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

64.    At all relevant times, the material misrepresentations and omissions particularized in this complaint, and the ultimate disclosures thereof, directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.

65.    During the Class Period, as detailed herein, Defendants engaged in a scheme and course of conduct to create, prop up, perpetuate and manipulate for their own benefit an artificial market for ARSs, and to artificially inflate the price of ARSs marketed and sold by Citigroup. This course of conduct that operated as a fraud or deceit on purchasers of these securities by omitting to disclose material risks concerning the liquidity of ARSs.  Such risks included factors that made them very different from cash equivalent investments, such as the overwhelming, if not total, dependence of the ARS market on the willingness of Citigroup and other broker-dealers to continue to create an artificial demand in order to sustain the ARS market and keep auctions from failing.  Defendants made materially false and misleading statements about the nature and characteristics of the ARS market, the ARSs themselves, and the auctions at which they were traded and sold. The purported value of the ARSs was artificially inflated by this

23

deception. Among after things, the interest rates on ARSs were much lower than the rate buyers would have demanded had they known these investments were not truly cash equivalents or suitable alternatives to investments such as CDs or money market funds, or had fully understood the liquidity risks involved, and the artificial and unreliable nature of the demand created and sustained by the broker-dealers. Given the higher interest rate that would have resulted from full disclosure, buyers would have been able to acquire a lower face amount of ARSs while still obtaining the same dollar amount of interest they received on the ARSs actually purchased. Defendants' material misrepresentations and omissions were disclosed and became known to the investing public when the ARS market collapsed, and the securities themselves became illiquid. Defendants' (and other broker dealers') decisions to cease artificially creating and sustaining the ARS market caused the dramatic collapse of the ARS market -- a process that had been fraudulently concealed from the Class -- and also finally began to reveal the nature and extent of Defendants' massive fraud in connection with the marketing and sale of ARSs. As a result, the perceived values of ARSs have declined substantially. For example, as alleged herein, Citigroup, UBS, and other broker/dealers have begun writing down the value of ARSs to reflect the fact they were actually worth materially less than their face amount.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

### FRAUD-ON-THE-MARKET DOCTRINE

66.     The ARS market (on which Citigroup and other broker-dealers marketed and sold ARSs), until the truth came out and prior to its collapse, was at all relevant times hereto open, well-developed and efficient.

67.     Plaintiff relies, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    (a)    Defendants made false and misleading public misrepresentations and failed to disclose adverse facts during the Class Period;

    (b)    The omissions and misrepresentations were material;

    (c)    ARSs traded in an efficient market;

    (d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge, among other things, the value of the securities at issue; and

    (e)    Plaintiff and the other members of the Class purchased ARSs between the time Defendants failed to disclose and misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

68.    The market for ARSs digested current information regarding these securities and reflected such information in the prices of ARSs. As would be expected where a security is traded in an efficient market, material news concerning ARSs had a prompt and immediate effect on the market price of these securities, as evidenced by, among other things, the rapid decline in the market price occurring after the seizure of the ARS markets in mid-February, 2008, as described herein. Under these circumstances, all purchasers of ARSs from Citigroup (not to mention from other broker-dealers) during the Class Period suffered similar injury due to the fact that the price of those securities was artificially inflated throughout the Class Period. At the times they purchased or otherwise acquired these ARSs, Plaintiff and other Class members were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

## CITIGROUP'S USE OF UNIFORM AND STANDARDIZED SALES PITCH CONTAINING MATERIALLY MISLEADING OMISSIONS

69.    Alternatively, and even in the event that the Court determines that the market for ARSs was not efficient during the Class Period, a presumption of reliance is applicable here due to Citigroup's use of uniform and standardized sales pitches containing materially misleading omissions regarding, *inter alia*, the true nature of ARS investments, the risks of illiquidity of the

ARS market and Citigroup's (and other broker-dealers') virtual wholesale creation and sustenance of that market.

70.    Here, Citigroup brokers were required to and did use uniform, standardized, and materially identical sales pitches created and/or approved by Citigroup senior management to market and sell ARSs to unsuspecting investors such as the Plaintiff herein. These sale pitches did not vary appreciably, if at all, among Class members, and uniformly omitted material facts concerning, among other things, the true nature of ARS investments, the true extent and nature of the illiquidity risks of investments in ARSs and the fact that Citigroup (and other broker-dealers) were constantly not merely participating in the ARS market and auctions, but that without their routine and constant involvement, this market and these auctions would not and could not even exist or occur as they did.

71.    Furthermore, in light of Defendants' knowledge that the sales force was routinely representing to investors that ARSs were liquid and cash equivalents, and suitable alternatives to money market funds and CDs, it was materially misleading for Defendants to fail to correct the record and state expressly that ARSs were, among other things, in fact not liquid or cash equivalents, or suitable money market or CD or similar investment alternatives.

72.    As set forth herein, Plaintiff and the other Class members would not have invested in ARSs, or at least would not have purchased their ARS investments on the terms at which they actually did so, had the Defendants' material omissions not concealed the true nature of the ARS investments and the risks related thereto. Plaintiff's and the other Class members' fraud-based claims stem largely if not entirely from misleading material omissions, for which reliance may be presumed.

## COUNT I

### Violations Of Section 10(b) Of The Exchange Act
### Against All Defendants

73.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf of itself and the Class.

74.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did, among other things: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) enable Defendants to sell hundreds of millions, if not billions, of dollars of ARSs to current and prospective Citigroup clients, and on which Citigroup collected many millions of dollars in fees and commissions; and (iii) cause Plaintiff and other Class members to purchase ARSs from Citigroup at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

75.    Defendants (a) employed devices, schemes, and artifices to defraud;  (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading;  and (c) engaged in acts, practices, and a course of business and conduct which operated as a fraud and deceit upon the purchasers of ARSs from Citigroup in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants herein are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

27

76.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material adverse information about the ARSs sold by Citigroup, as specified herein.

77.     These Defendants engaged in the scheme and conduct alleged herein, including using devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the ARSs being marketed and sold by Citigroup were as good as cash or were cash equivalents, similar to money market funds or CDs, and were liquid and safe investments, suitable for short-term investing and for investors with as little as $25,000 of available cash and/or as little as one week in which to invest. Defendants' conduct, which involved and included the making of, or the participation and acquiescence in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the ARSs and that ARS market, in the light of the circumstances under which they were made, not false and misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business and conduct which operated as a fraud and deceit upon the purchasers of ARSs from Citigroup during the Class Period, *i.e.*, the Class members.

78.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate and reckless disregard for the truth in that they failed to ascertain and to disclose such facts which were fully accessible to them. Such Defendants' material misrepresentations and/or omissions were done knowingly and/or deliberately and recklessly and for the purpose and effect of concealing the truth about the

liquidity of and other risks associated with ARSs from the investing public and supporting the artificially inflated price and market for these securities. If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were deliberate and reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

79.    At all relevant times, the senior management and/or directors of Citigroup knew and/or recklessly disregarded that the ARSs continued liquidity depended on the purely voluntary willingness of Citigroup and the other major broker-dealers to serve as buyers of ARSs in order to create and sustain the market demand necessary to keep the ARS market alive, and to keep the auctions from failing. Defendants knew this fact because Citigroup itself was a prominent participant in (and often a manager or agent of) the auctions, but knowingly or recklessly failed to disclose this material information to Plaintiffs and the class members.

80.    Moreover, upon information and belief, even while ARSs were being aggressively marketed to individual investors by Citigroup in 2007, Defendants knew that the corporate clients of Citigroup and other broker-dealers were fleeing the ARSs in droves, having apparently become concerned that ARSs were not cash equivalents. As Defendants also knew, major accounting firms (upon information and belief, including their own auditor, KPMG) advised their corporate clients several years ago to change the way ARSs were treated on their balance sheets, and to stop classifying them as "cash equivalents." Upon information and belief, those in executive management positions at Citigroup were monitoring events in the marketplace with respect to ARSs as part of their responsibilities to their shareholders and their company, and were thus privy to facts and information which indicated that ARSs were and were becoming increasingly risky and would become virtually completely illiquid if Citigroup and the other

29

major broker-dealers decided not to continue their artificial support of the ARS market. Citigroup's own balance sheet problems were recognized within Citigroup as a reason why it was undesirable for Defendants to keep acquiring ARSs and participating in and supporting the ARS market to prevent failed auctions. Other major broker-dealers that were also supporting the ARS auctions, such as Merrill Lynch, UBS, and others, also had serious balance sheet problems. At the same time, Defendants were unloading these securities on unsuspecting individual clients, at times from their own inventory, using a uniform and misleading sales pitch that they were, *inter alia*, liquid, cash equivalents, and suitable alternatives to money market funds, CDs, or similar investments, and appropriate for very short-term investment.

81.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the ARSs marketed and sold by Citigroup was artificially inflated during the Class Period. In ignorance of the fact that the market prices of ARSs were artificially inflated, and relying directly or indirectly upon the integrity of the auction market in which the ARSs were traded, or on the materially false and misleading statements made by Defendants, and/or the absence of material adverse information that was known to or deliberately disregarded, omitted or concealed by Defendants and not disclosed by Defendants during the Class Period. Plaintiff and the other members of the Class acquired ARSs marketed and sold by Citigroup during the Class Period at artificially inflated prices and/or for unduly low interest rates and were damaged thereby.

82.     At the time of said misrepresentations and omissions, Plaintiff and other Class members were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the nature of these investments, including, among other things, the illiquidity of and other risks associated with the

ARSs marketed and sold by Citigroup, as outlined herein, but which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased their ARSs, or, if they had acquired such securities during the Class Period, they would not have paid the artificially inflated prices which they paid for these securities.

83.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

84.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other Class members suffered damages in connection with their respective purchases of ARSs marketed and/or sold by Citigroup during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendants Citigroup And Citigroup Global Markets, Inc.

85.    Plaintiff repeats and realleges each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf of itself and the Class.

86.    Defendant Citigroup Inc. acted as a control person of Defendant Citigroup Global Markets, Inc., and Citi Smith Barney, within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of its 100% ownership and control of these subsidiaries, Citigroup Inc. had the power to influence and control and did influence and control, directly and indirectly, the decision-making by these subsidiaries, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  In turn, by virtue of its 100% ownership of Citi Smith Barney (a division of Citigroup Capital Markets, Inc.), Citigroup Global Markets, Inc. had the power to influence and control and did influence and control, directly and indirectly, the decision-making by Citi Smith Barney, including the content and dissemination of

31

the various statements and representations which Plaintiff contends are false and misleading, and the omission of certain material facts and information concerning ARSs and the ARS market necessary to make any such statements or representations not materially false and misleading. Citigroup, its principals, and these subsidiaries, were provided with or had unlimited access to copies of the reports, press releases, public filings, client statements, and other materials and information alleged by Plaintiff herein to be misleading prior to and/or shortly after these statements were issued, and also had the ability to prevent the issuance of these materials, or to cause them to be corrected.

87.    As set forth above, Citigroup, Inc. and Citigroup Global Markets, Inc., violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, these entities are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchase and retention of ARSs from Citigroup during the Class Period.

## COUNT III

### Violations of the Investment Advisers Act (IAA) of 1940, 15 U.S.C. § 80b-1, *et seq.* Against All Defendants

88.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

89.    Defendant Citigroup and/or its subsidiaries and affiliates listed herein are investment advisers under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, who entered into express brokerage contracts with Plaintiff and other Class members. Defendant Citigroup, for compensation, engages in the business of advising Plaintiff and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the

32

advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C.

§ 80b-2(11). The creation, maintenance and provision of a market for ARSs was not incidental

to the conduct of Defendants' usual brokerage business, and Citigroup receives and has received

special compensation therefore.

90.    By reason of the conduct set forth herein, and the above-described omissions,

concealment and misrepresentation of material facts, Defendants acted in violation of 15 U.S.C.

§ 80b-6, Prohibited transactions by investment advisers, which provides that

> It shall be unlawful for any investment adviser, by use of the mails
> or any means or instrumentality of interstate commerce, directly or
> indirectly--
>
> (1) to employ any device, scheme, or artifice to defraud any
> client or prospective client;
>
> (2) to engage in any transaction, practice, or course of business
> which operates as a fraud or deceit upon any client or prospective
> client;
>
> (3) acting as principal for his own account, knowingly to sell any
> security to or purchase any security from a client, or acting as
> broker for a person other than such client, knowingly to effect any
> sale or purchase of any security for the account of such client,
> without disclosing to such client in writing before the completion
> of such transaction the capacity in which he is acting and obtaining
> the consent of the client to such transaction. The prohibitions of
> this paragraph (3) shall not apply to any transaction with a
> customer of a broker or dealer if such broker or dealer is not acting
> as an investment adviser in relation to such transaction;
>
> (4) to engage in any act, practice, or course of business which is
> fraudulent, deceptive, or manipulative. The Commission shall, for
> the purposes of this paragraph (4) by rules and regulations define,
> and prescribe means reasonably designed to prevent, such acts,
> practices, and courses of business as are fraudulent, deceptive, or
> manipulative.

91.    Moreover, under the IAA, Defendants, as investment advisers, owed to Plaintiff

and other members of the Class a fiduciary duty to fully and fairly disclose to all material facts

and information, and an affirmative obligation to employ reasonable care to avoid misleading their clients.

92.    In breach of their fiduciary duties to Plaintiff and other members of the Class and in violation of the IAA, Defendants made the herein described omissions, concealment and misrepresentation of material facts and information concerning their actions as "Financial Advisors" to customers in connection with ARSs, thereby deceiving Plaintiff and other members of the Class with full knowledge that their conduct was false and misleading due to material omissions and/or misrepresentations.

93.    As a result of these breaches of fiduciary duties, Plaintiff and other Class members' purchases, investments and/or acquisitions of ARSs are void under Section 15 of the IAA, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

94.    Further, Defendants acquired rights under and were benefited by these acts and conduct as set forth above and had actual knowledge of the conduct engaged in that violated the IAA.

95.    In addition to seeking a declaratory judgment that the ARS transactions with Plaintiff and the Class are null and void, Plaintiff seeks rescission, and an accounting and restitution for the benefit of all Class members who request rescission, returning all monies and

fees wrongfully obtained by Defendants and disgorgement of all profits made by the Defendants due to their conduct in violation of the IAA.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class Representative under FRCP 23 and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding those class members who purchased ARSs from Citigroup the option of rescinding their purchases and recovering the full amount paid plus interest thereon;

D.    Declaring that all amounts received by Citigroup from or related to the marketing, sale of ARSs to Plaintiff and the Class members, and all proceeds thereof, are held as a constructive trust by Citigroup for the benefit of Plaintiff and the Class members herein;

E.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

G.    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May 8, 2008

Respectfully submitted,

MILBERG LLP

By: _____

Jerome M. Congress (JC-2060)
Kent A. Bronson (KB-4906)
One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
jcongress@milberg.com
kbronson@milberg.com

*Counsel for Plaintiff Wedgewood Tacoma LLC*
*And The Proposed Class*

36

**CERTIFICATION OF PLAINTIFF**

I, Pamela R. Mayer, as Manager of Wedgewood Tacoma, LLC do hereby certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party who acts on behalf of a class in directing and supervising the action, either individually or as part of a group, including as a Lead Plaintiff, a named plaintiff, and/or as a class representative, and I understand that my duties as such may include, among other things, providing testimony at deposition and trial, if necessary.

4. I represent and warrant that I am authorized to execute this Certification on behalf of the purchaser of the subject securities described herein (including, as the case may be, myself, any co-owners, any corporations or other entities, and/or any beneficial owners).

5. I will not accept any payments for serving as a representative party on behalf of the class beyond the purchaser's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is unaffected by my decision to serve as a representative party.

7. I have listed below all my transactions in Auction Rate Securities sold to Wedgewood Tacoma, LLC through Citigroup Global Markets, Inc. during the Class Period set forth in the Complaint:

| Description | Transaction | Transaction Date | Price |
|---|---|---|---|
| BLACKROCK STRATEGIC MUN TR PFD RATE 3.229% RESET 4/2/08 1UT = 25,000 SER W INT: Variable | Purchase | 1/2/04 | 350,000 |
| NUVEEN INSD QLTY MUN FD MUN RATE 3.229% Reset 4/2/08 7DY ADJ 1 UT = $25,000.00 CALLABLE INT: VARIABLE | Purchase | 12/2/04 | 225,000 |
| NUVEEN INSD DIVIDEN ADV RATE 3.229% Reset 4/3/08 MUN FD TH AUC RT PFD SHS INT: VARIABLE | Purchase | 1/2/04 | 125,000 |
| WESTERN ASSET MANAGED MUNS FD RATE 3.016% RESET 4/7/08 AUCTION RATE PFD STK SER M INT: VARIABLE | Purchase | 7/11/05 | 100,000 |
| WESTERN ASSET MANAGED MUNS FD RATE 3.229% RESET 4/3/08 AUCTION RATE PFD STK SER H INT: VARIABLE | Purchase | 1/2/04 | 500,000 |
| WESTERN ASSET MANAGED MUNS FD RATE 3.229% RESET 4/3/08 AUCTION RATE PFD STK SER H INT: VARIABLE | Purchase | 2/23/06 | 350,000 |
| WESTERN ASSET MANAGED MUNS FD RATE 3.229% RESET 4/3/08 AUCTION RATE PFD STK SER H INT: VARIABLE | Purchase | 2/24/06 | 50,000 |

These securities were acquired or held in (check all that apply):

❑ General (non-retirement account)          ❑ Merget/acquisition/distribution          ❑ Gift
❑ IRA                                       ❑ Employer-sponsored plan (401k, 403b, etc.)

8. During the three years prior to the date of this Certification, I have not sought to serve and I have not served as a representative party for a class in an action filed under the federal securities laws except as described below (if any):

I declare under penalty of perjury, under the laws of the United States, that the information entered is accurate.

Executed this _____7_____ day of May, 2008

Signature _____
                Pamela R. Mayer
                Wedgewood Tacoma, LLC