## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| LHB INSURANCE BROKERAGE INC., on behalf of itself and all others similarly situated, | ) ) ) | **ECF CASE** |
| Plaintiff, | ) ) | Civil Case No: 1:08-CV-03095-LTS |
| v. | ) | |
| CITIGROUP INC. and CITIGROUP GLOBAL MARKETS, INC., | ) ) ) | |
| Defendants. | ) ) | |
| LISA SWANSON, Individually And On Behalf of All Others Similarly Situated, | ) ) ) | **ECF CASE** |
| Plaintiff, | ) ) | Civil Case No: 1:08-CV-03139-LTS |
| v. | ) | |
| CITIGROUP, INC., CITIGROUP GLOBAL MARKETS, INC. and CITI SMITH BARNEY, | ) ) ) | |
| Defendants. | ) ) | |

[Additional Captions to Follow]

## DECLARATION OF RICHARD A. SPEIRS IN FURTHER SUPPORT OF THE MOTION OF DR. MICHAEL A. PASSIDOMO FOR CONSOLIDATION AND FOR APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL, AND IN OPPOSITION TO COMPETING MOTIONS

|  |  |
|---|---|
| SAMUEL A. STOCKHAMER and ALICE L. STOCKHAMER, On Behalf of Themselves and All Others Similarly Situated, | ) ) ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CITIGROUP INC. and CITIGROUP GLOBAL MARKETS, INC., | ) ) |
|  | ) |
| Defendants. | ) |

**ECF CASE**

Civil Case No: 1:08-CV-03904-LTS

|  |  |
|---|---|
| WEDGEWOOD TACOMA LLC, Individually And On Behalf of All Others Similarly Situated, | ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CITIGROUP INC., CITIGROUP GLOBAL MARKETS, INC., and CITI SMITH BARNEY, | ) ) |
|  | ) |
| Defendants. | ) |

**ECF CASE**

Civil Case No: 1:08-CV-04360-LTS

|  |  |
|---|---|
| SAED GHALAYINI, Individually And On Behalf of All Others Similarly Situated, | ) ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CITIGROUP INC., CITIGROUP GLOBAL MARKETS, INC., and CITI SMITH BARNEY, | ) ) |
|  | ) |
| Defendants. | ) |

**ECF CASE**

Civil Case No: 1:08-CV-05016-UA

I, Richard A. Speirs, under penalty of perjury, hereby declare:

1.      I am a member of the firm of Zwerling, Schachter & Zwerling, LLP ("Zwerling, Schachter"), counsel for Movant Dr. Michael A. Passidomo, and am admitted to practice in the United States District Court for the Southern District of New York.  I am fully familiar with all the facts and circumstances herein.

2.      This declaration is submitted in further support of the Motion of Dr. Passidomo for Consolidation and for Appointment of Lead Plaintiff and Lead Counsel, and in Opposition to Competing Motions.

3.      Attached hereto as Exhibit A is a copy of the docket sheet and the complaint filed in *Ghalayini v. Citigroup, Inc.*, Case No. 1:08-CV-5016-UA (S.D.N.Y.).

4.      Attached hereto as Exhibit B is a true and correct copy of a June 12, 2008 Law.com article entitled "Sources Say Milberg to Pay $75 Million to Resolve Criminal Charges."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 16th day of June, 2008 in New York, New York.


By:   ___/s/ Richard A. Speirs_____
        Richard A. Speirs (RS 8872)
        Zwerling, Schachter & Zwerling, LLP
        41 Madison Avenue, 32nd Floor
        New York, NY 10010
        Tel:  (212) 223-3900
        Fax:  (212) 371-5969
        rspeirs@zsz.com

        *Attorney for Dr. Michael A. Passidomo*

Exhibit A

ECF, REFERRED

# U.S. District Court
# United States District Court for the Southern District of New York
# (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:08-cv-05016-UA

Ghalayini v. Citigroup Inc. et al
Assigned to: Judge Unassigned
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 05/30/2008
Jury Demand: Plaintiff
Nature of Suit: 850
Securities/Commodities
Jurisdiction: Federal Question

## Plaintiff

**Saed Ghalayini**
*Individually and on behalf of all*
*others similarly situated*

represented by **Edith M. Kallas**
Whatley, Drake & Kallas, LLC
1540 Broadway
37th Floor
New York, NY 10036
(212) 447-7070
Fax: (212) 447-7077
Email: ekallas@wdklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joe R. Whatley, JR.**
Whatley Drake & Kallas, LLC
1540 Broadway
37th Floor
New York, NY 10036
(212) 447-7070
Fax: (212) 447-7077
Email:
jwhatley@whatleydrake.com
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Joseph Peter Guglielmo**
Whatley Drake & Kallas, LLC
1540 Broadway
37th Floor
New York, NY 10036
(212) 447-7070
Fax: (212) 447-7077
Email:
jguglielmo@whatleydrake.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**V.**

**Defendant**

**Citigroup Inc.**

**Defendant**

**Citigroup Global Markets, Inc.**

**Defendant**

**Citi Smith Barney**

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/30/2008 | 1 | COMPLAINT against Citigroup Inc., Citigroup Global Markets, Inc., Citi Smith Barney. (Filing Fee $ 350.00, Receipt Number 652732)Document filed by Saed Ghalayini.(mbe) (mbe). (Entered: 06/03/2008) |
| 05/30/2008 |   | SUMMONS ISSUED as to Citigroup Inc., Citigroup Global Markets, Inc., Citi Smith Barney. (mbe) (Entered: 06/03/2008) |
| 05/30/2008 |   | CASE REFERRED TO Judge Laura Taylor Swain as possibly related to 1:08-cv-3095. (mbe) (Entered: 06/03/2008) |

| 05/30/2008 | | Case Designated ECF. (mbe) (Entered: 06/03/2008) |
|---|---|---|
| 06/04/2008 | | ***NOTE TO ATTORNEY TO E-MAIL PDF. Note to Attorney for noncompliance with Section (3) of the S.D.N.Y. 3rd Amended Instructions For Filing An Electronic Case or Appeal and Section 1(d) of the S.D.N.Y. Procedures For Electronic Case Filing. E-MAIL the PDF for Document 1 Complaint to: case_openings@nysd.uscourts.gov. (mbe) (Entered: 06/04/2008) |
| 06/11/2008 | 2 | ORDER SETTING BRIEFING AND HEARING SCHEDULE FOR CONSOLIDATION, APPOINTMENT OF LEAD PLAINTIFF, AND APPOINTMENT OF LEAD COUNSEL MOTIONS, that any and all papers in opposition to the afore-mentioned motions, with a courtesy copy for chambers no later than 6/16/08. Any and all reply papers, with courtesy copy to chambers, no later than 6/20/08. A hearing concerning the appointment of a lead plaintiff set for 6/24/08, at 12:45 pm in Courtroom 17C, and as further set forth in this document. Set Deadlines/Hearing ( Responses due by 6/16/2008. Replies due by 6/20/2008. Motion Hearing set for 6/24/2008 at 12:45 PM in Courtroom 17C, 500 Pearl Street, New York, NY 10007 before Judge Laura Taylor Swain.) (Signed by Judge Laura Taylor Swain on 6/11/08) (cd) (Entered: 06/11/2008) |

## PACER Service Center

### Transaction Receipt

06/13/2008 17:20:53

| PACER Login: | zs0006 | Client Code: | Optional for PACER use only |
|---|---|---|---|
| Description: | Docket Report | Search Criteria: | 1:08-cv-05016-UA |
| Billable Pages: | 1 | Cost: | 0.08 |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

SAED GHALAYINI, Individually )
and On Behalf of All Others Similarly )
Situated, )
            ) **'08 CIV 5016**
            ) Civil Action No.
     Plaintiff, )
            ) CLASS ACTION COMPLAINT
v. ) FOR VIOLATIONS OF FEDERAL
            ) SECURITIES LAWS
CITIGROUP INC., CITIGROUP GLOBAL )
MARKETS, INC. and CITI SMITH )
BARNEY, )
            ) **JURY TRIAL DEMANDED**
            )
     Defendants. )

## INTRODUCTION

Plaintiff, individually and on behalf of all other persons similarly situated, hereby

alleges the following upon personal knowledge as to himself and upon information and

belief as to all other matters based upon the investigation of his attorneys, which

included, *inter alia*, a review of the publicly available documents, press releases,

regulatory filings with the United States Securities and Exchange Commission ("SEC"),

securities analysts' reports, and interviews with purchasers of ARS. Plaintiff believes

that substantial additional evidentiary support will exist for the allegations set forth

herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     Plaintiff brings this action as a class action under Sections 10(b) and 20(a)

of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or

entities who purchased and continue to hold auction rate securities ("ARS") offered for

sale by Defendants between May 27, 2003 and February 13, 2008, inclusive (the "Class

1

Period").

2.      Defendants represented to investors that ARS were "cash equivalents" or

better than money market funds, and that these securities were highly liquid and safe for

short-term investing. Defendants also represented that ARS were suitable for any

investor with at least $25,000 of available cash and as little as one week in which to

invest.

3.      Defendants knew, but failed to disclose to investors, material facts about

ARS. In particular, Defendants knew, but failed to disclose that these ARS were not

cash alternatives, but were instead, complex, long-term financial instruments with 30-

year maturity dates, or longer. Defendants knew, but failed to disclose that ARS were

only liquid at the time of sale because Defendants were artificially supporting and

manipulating the auction market to maintain the appearance of liquidity and stability.

Defendants knew, but failed to disclose that ARS would become illiquid as soon as

Defendants stopped maintaining the auction market.

4.      Defendants also knew that the statements issued or disseminated

about ARS were materially false and misleading; knew that such statements or

documents would be issued or disseminated to the investing public; and knowingly

and substantially participated in or acquiesced to the issuance or dissemination of

such statements or documents as primary violations or the federal securities laws.

As set forth herein in detail, Defendants, by virtue of their receipt of information

reflecting the true facts regarding the ARS market, their control over and/or their

associations with the ARS market which made them privy to confidential

proprietary information concerning the ARS market, participated in the fraudulent

2

scheme alleged herein.

5.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described could not have been perpetrated over a substantial period of time, as described herein, without the knowledge and complicity of senior Citigroup executives. Defendants were motivated to materially misrepresent the true nature of the ARS auction market in order to: (i) attract new investors who would only invest in ARS if they believed a highly liquid auction market existed; (ii) unload ARS in their inventory to unsuspecting investors who believed they were purchasing a liquid investment; and (iii) continue collecting substantial fees for managing the ARS auctions on behalf of issuers.

6.     On February 13, 2008, 87% of all auctions of ARS failed when Defendants and all other major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, the market for ARS collapsed, leaving the holders of more than $300 billion in ARS with no means of liquidating investments Defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange

3

Commission ("SEC") (17 C.F.R. 240.10b-5).

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337. Defendants maintain their principal places of business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

9.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.    Plaintiff Saed Ghalayini is a resident of the United States who is currently living abroad. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased ARS underwritten and sold by Citigroup during the Class Period and continued to hold such auction securities as of February 13, 2008.

11.    Defendant Citigroup Inc. is a Delaware corporation, with its principal executive offices in New York, New York. Citigroup Inc. is one of the world's leading financial firms.

12.    Defendant Citigroup Global Markets, Inc. is a Delaware corporation with its principal executive offices located in New York, New York. Citigroup Global Markets, Inc. is a wholly-owned subsidiary of Citigroup, Inc., is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").

4

13.    Defendant Citi Smith Barney is a Delaware corporation with its principal executive offices located in New York, New York. Citi Smith Barney is a division of Citigroup Global Markets, Inc. and, through its financial advisors, provides brokerage, investment banking and asset management services to Citigroup clients worldwide.

14.    In this Complaint, the three Citigroup Defendants are referred to collectively as "Citigroup," unless specifically noted.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased ARS from Citigroup between May 27, 2003 and February 13, 2008, inclusive, and continued to hold such ARS as of February 13, 2008 (the "Class"). Excluded from the Class are Defendants, the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

16.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. The market for ARS, while it existed, was estimated to exceed $350 billion in the United States and Citigroup is one of the largest broker-dealers of ARS while the market for such securities existed. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

5

securities class actions.

17.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with ARS and the market for such securities; and

(c)    The extent to which members of the Class have sustained damages and the proper measure of such damages.

18.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in

6

the management of this action as a class action.

21.    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## FACTS

22.    The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." ARS generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

23.    ARS were first introduced in the 1980s. Since then, the market for ARS grew dramatically and the current estimated value of ARS in existence (prior to the collapse of the auction market) is approximately $350 billion.

24.    Investments in ARS were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of ARS have lowered the minimum amount invested to $25,000, in an effort to market ARS as

widely as possible to the general public.

25.    ARS were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as ARS.

26.    The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

27.    The auction itself was of the type commonly referred to as a "Dutch" auction, *i.e.,* one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For ARS, bids with successively higher rates were offered until all of the securities at the auction were sold.

28.    At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

29.     During an auction, an investor could submit one of four different orders: (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate. Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

30.     If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred. In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index. Either way, the maximum rate was set out in the prospectus. If the auction failed then none of the current shareholders could sell their shares, no matter what type of order they issued. The maximum rate for many ARS, particularly those invested in corporate debt securities or preferred stocks, was relatively small, however. As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

31.     The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

32.     Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the

9

broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

33.    Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the SEC began to investigate these manipulative practices affecting the auction market. In 2006, the SEC entered into a consent decree with a number of major broker-dealers which required them to disclose certain practices to investors and to stop engaging in certain other practices. The SEC consent decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed. The consent decree did nothing to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

**Citigroup Made Material Misrepresentations and Omissions During the Class Period Regarding the Liquidity of and Risks Associated With ARS**

34.    ARS were extremely profitable for Citigroup and for the Citigroup financial advisors who sold the securities. As one of the largest underwriters of ARS, Citigroup received significant underwriting fees from the issuers of these securities. As one of the largest broker-dealers, Citigroup also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process for more than ARS. Citigroup also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell ARS for its own account. Individual Citigroup financial advisors had a significant financial incentive to

10

sell ARS, as they were compensated by Citigroup for each auction rate security sold.

35.    In order to perpetuate the auction market and sell as many ARS as possible, Citigroup represented to investors in its written materials and uniform sales presentations by financial advisors that ARS were the same as cash and were highly liquid, safe investments for short-term investing.  Pursuant to uniform sales materials and top-down management directives, Citigroup financial advisors throughout the United States represented to current and potential Citigroup clients that the ARS sold by Citigroup were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

36.    Citigroup failed to disclose to purchasers of ARS material facts about these securities.  Citigroup failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30-year maturity dates, or longer.  Citigroup failed to disclose that the ARS it was selling were only liquid at the time of sale because Citigroup and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability.  In fact, at all relevant times during the Class Period, the ability of holders of ARS to liquidate their positions depended on the maintenance of an artificial auction market maintained by Citigroup and the other broker-dealers.  When Citigroup and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the ARS sold by Citigroup became illiquid.  Citigroup also failed to disclose that the ARS it was selling were not short-term investments, but rather long term

11

bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, Citigroup failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their ARS into cash depended entirely on the perpetuation of the artificial auction market being maintained by Citigroup and the other broker-dealers.

37.    Citigroup also failed to disclose to purchasers of ARS material facts about its role in the auctions and the auction market in which these securities were traded. Citigroup failed to disclose that in connection with the sale of ARS, Citigroup simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to Citigroup on its holdings of the ARS. Citigroup failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. Citigroup failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of ARS. Citigroup continued to aggressively market ARS after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for ARS would result.

38.    During the Class Period, Citigroup failed to disclose that the auctions it was conducting were not governed by arms-length transactions but instead suffered from systemic flaws and manipulative practices, including allowing customers to place open or market orders in auctions, intervening in auctions by bidding for Citigroup's proprietary account or asking customers to make or change orders, preventing failed

auctions and all-hold auctions to set the market rate, submitting or changing orders after auction deadlines, not requiring customers to purchase partially-filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate, and providing inside information about the auction process to certain customers in connection with the auction bidding.

### The ARS Market Collapses

39.    In the summer of 2007, some auctions for ARS backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire ARS market. In the fall-winter of 2007, more auctions began to fail. Even though some of the auctions that failed initially were conducted by Citigroup, it continued to encourage investors to purchase ARS and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

40.    On February 13, 2008, 87% of all auctions of ARS failed when all of the major broker-dealers, including Citigroup, refused to continue to support the auctions.

41.    The next day, Citigroup, the second largest underwriter of ARS, disclosed that it would no longer support the auction market. Virtually every other major broker-dealer, including Merrill Lynch, Goldman Sachs, Lehman Brothers, UBS and Wachovia, among others, also decided on or about that same time to withdraw their support of the auction market. As a result of the withdrawal of support by all of the major broker-dealers, the market for ARS has collapsed, rendering more than $300 billion of outstanding securities illiquid.

42.    The market for ARS sold by Citigroup was open, well-developed and

efficient at all relevant times until the truth emerged and the auction market collapsed. As a result of the materially false and misleading statements and failures to disclose, ARS sold by Citigroup traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased and continued to hold ARS sold by Citigroup relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

43.    During the Class Period, Defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of ARS sold by Citigroup by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Defendants' statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the ARS sold by Citigroup, as alleged herein.

44.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the auction market and the ARS sold by Citigroup. These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market an unrealistically positive assessment of the ARS sold by Citigroup, thus causing those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and

misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing and continuing to hold ARS sold by Citigroup at artificially inflated prices, thus causing the damages complained of herein.

## SAFE HARBOR ALLEGATIONS

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Citigroup who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

46.    During the Class Period, as detailed herein, Defendants engaged in a scheme and course of conduct to create a market for and artificially inflate the price of ARS sold by Citigroup that operated as a fraud or deceit on purchasers of ARS sold by Citigroup by misrepresenting the liquidity of and risks associated with such securities. Defendants achieved this by making false and misleading statements about the auction market and the ARS sold by Citigroup. When Citigroup's prior misrepresentations and

15

omissions were disclosed and became apparent to the investing public, the market for

ARS collapsed and the ARS sold by Citigroup have become illiquid. As a result of their

purchases of ARS from Citigroup during the Class Period, Plaintiff and other members

of the Class suffered economic loss, *i.e.,* damages under the federal securities laws in that

the securities have substantially less value than that represented by Defendants.

47.     The collapse of the ARS market at the end of the Class Period was a direct

result of Defendants' unilateral decision to no longer artificially support the ARS market

and the nature and extent of Defendants' fraud finally being revealed to investors.

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act**
**Against All Defendants**

48.     Plaintiff repeats and realleges each and every allegation set forth in the

paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on

behalf of himself and the Class.

49.     During the Class Period, Defendants carried out a plan, scheme and

course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiff and other Class members, as alleged

herein; (ii) enable Defendants to sell millions of dollars of ARS to current and

prospective Citigroup clients, and on which Citigroup made substantial commissions;

and (iii) cause Plaintiff and other members of the Class to purchase ARS from

Citigroup at artificially inflated prices. In furtherance of this unlawful scheme, plan and

course of conduct, Defendants, jointly and individually (and each of them) took the

actions set forth herein.

50.     Defendants (a) employed devices, schemes, and artifices to defraud; (b)

16

made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of ARS from Citigroup in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

51.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the ARS sold by Citigroup, as specified herein.

52.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the ARS sold by Citigroup were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements. of material facts and omitting to state material facts necessary in order to make the statements made about the ARS in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of ARS from Citigroup during the Class Period.

53.     The Defendants had actual knowledge of the misrepresentations and

omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts. Such Defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with ARS from the investing public and supporting the artificially inflated price and market for these securities. If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the ARS sold by Citigroup was artificially inflated during the Class Period. In ignorance of the fact that the market prices of ARS were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the auction market in which the ARS were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired and continued to hold ARS sold by Citigroup during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth

18

regarding the liquidity of and risks associated with the ARS sold by Citigroup, which were

not disclosed by Defendants, Plaintiff and other members of the Class would not have

purchased and continued to hold their ARS, or, if they had acquired such securities during

the Class Period, they would not have done so at the artificially inflated prices which

they paid.

56.     By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

57.     As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and the other members of the Class suffered damages in connection with their

respective purchases of ARS sold by Citigroup during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendants Citigroup Inc. and Citigroup Global Markets, Inc.

58.     Plaintiff repeats and realleges each and every allegation set forth in the

paragraphs above as if fully set forth herein.  Plaintiff brings this cause of action on behalf

of themselves and the Class.

59.     Defendant Citigroup Inc. acted as a control person of Defendants

Citigroup Global Markets, Inc. and Citi Smith Barney within the meaning of Section

20(a) of the Exchange Act as alleged herein.  By virtue of its 100% ownership of

Defendants Citigroup Global Markets, Inc. and Citi Smith Barney, Citigroup Inc. had

the power to influence and control and did influence and control, directly or indirectly,

the decision-making by Citigroup Global Markets, Inc. and Citi Smith Barney including

the content and dissemination of the various statements which Plaintiff contend are false

and misleading.  Citigroup Inc. was provided with or had unlimited access to copies of

19

the reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.    Defendant Citigroup Global Markets, Inc. acted as a control person of Defendant Citi Smith Barney within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its 100% ownership of Defendant Citi Smith Barney, Citigroup Global Markets, Inc. had the power to influence and control and did influence and control, directly or indirectly, the decision-making by Citi Smith Barney including the content and dissemination of the various statements which Plaintiff contend are false and misleading. Citigroup Global Markets, Inc. was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.    As set forth above, Citigroup Global Markets, Inc. and Citi Smith Barney violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, Citigroup Inc. and Citigroup Global Markets, Inc. are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchase and retention of ARS from Citigroup during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

E.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: May 30, 2008                    Respectfully submitted,

_____
Joe R. Whatley, Jr.
Edith M. Kallas
Joseph P. Guglielmo
**Whatley Drake & Kallas, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: (212) 447-7070
Facsimile: (212) 447-7077

Joseph P. Danis
Michael J. Flannery
Corey D. Sullivan
CAREY & DANIS, LLC

21

8235 Forsyth Blvd.
Suite 1100
St. Louis, MO  63105
Telephone:  (314) 725-7700
Facsimile: (314) 721-0905

Edward M. Gergosian
GERGOSIAN & GRALEWSKI LLP
655 West Broadway
Suite 1410
San Diego, CA  92101
Telephone:  (619) 237-9500
Facsimile:  (619) 237-9555

A. Hoyt Rowell, III
Daniel O. Myers
T. Christopher Tuck
RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC  29464
Direct:  (843) 727-6500
Fax:  (843) 216-6509

***Attorneys for Plaintiff Saed Ghalayini***

## CERTIFICATION OF NAMED MOVANT
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Saed A. Ghalayini ("Movant"), declare under penalty of perjury, as to my claims

asserted under the federal securities laws against Citigroup Inc., Citigroup Global Markets, Inc.

and Citi Smith Barney, that:

1.    Movant has reviewed and/or authorized the filing of the complaint.

2.    Movant did not purchase any security that is the subject of this action at

the direction of Movant's counsel or in order to participate in this private action.

3.    Movant is willing to serve as a representative party on behalf of the class,

including providing testimony at deposition and trial, if necessary.

4.    Movant's transactions in Auction Rate Securities, which are the subject of

this action, during the Class Period specified in the complaint are as follows:

**Purchases:**

| Security | Number of shares | Date | Price |
|---|---|---|---|
| Cohen & Steers Adv Inc Rlty Fd | 4 | 12/22/05 | $100,000 |
| Cohen & Steers Adv Inc Rlty Fd | 6 | 3/30/06 | $150,000 |

**Sales:**

| Security | Number of shares | Date | Price |
|---|---|---|---|

5.    Movant has sought to serve as a class representative in the following cases

within the last 3 years:  None.

- 1 -

6.     Movant will not accept any payment for serving as a representative party on behalf of the class beyond Movant's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 25th day of May , 2008 in Riyadh, Saudi Arabia.

Saed A. Ghalayini

2

Exhibit B

Law.com: Sources Say Milberg to Pay $75 Million to Resolve Crimi... http://www.law.com/jsp/law/LawArticleFriendly.jsp?id=1202422208011



Valuable FREE Insights for
Students on Leading Law Firms



# LAW.COM

Select '**Print**' in your browser menu to print this document.

**Copyright 2008 ALM Properties, Inc. All rights reserved.**

Page printed from: http://www.law.com

Back to Article

## Sources Say Milberg to Pay $75 Million to Resolve Criminal Charges

Amanda Bronstad
06-12-2008

Milberg could agree to pay $75 million as soon as this week as part of an agreement to resolve criminal charges against the New York firm in the government's kickback case, according to a source familiar with the situation.

Federal prosecutors have alleged that Milberg and seven of its partners conspired to obtain $251 million in attorney fees by paying kickbacks to lead plaintiffs in shareholder and class action lawsuits. Four partners have pleaded guilty, including co-founding partner Melvyn Weiss, who was sentenced this month to 30 months in prison, and William Lerach, who reported to prison last month. Lerach is serving a sentence of 24 months.

Pre-trial motions in the case against Milberg, which faces an August trial, were due this month. On May 30, Milberg filed court papers seeking to extend the pre-trial deadlines.

*The Daily Journal* of Los Angeles reported on Wednesday that the agreement between Milberg and prosecutors could involve a monitor for two years and admissions of wrongdoing. Also, if after four years the lawyers do not engage in the same criminal activities, the government will drop the case.

Thom Mrozek, a spokesman for the U.S. Attorney's Office for the Central District of California, did not return a call for comment. A lawyer representing Milberg, Marc Harris, a partner at Mayer Brown in Los Angeles, declined to comment.



**ATTENTION Summer Associates**

Have you claimed your **FREE** POLO MATCH TICKETS?

www.meadowmatches.com

LegalTimes

